**RECEIVED**

MAY 1 1 2007

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

CHARLOTTE SMITH; CHANDLER SMITH,
a child, by his mother Charlotte Smith;
DARIUS SMITH, a child by his mother
Tajuana Smith, guardian                **PLAINTIFFS**

**VS.**                         CAUSE NO. _1:07CV113-m-D_

BRANDON PRESLEY, MAYOR OF NETTLETON,
MISSISSIPPI, 38858; THOMAS ADAMS,
 POLICE CHIEF OF NETTLETON;
GERRY TURNER, POLICE OFFICER           **DEFENDANTS**

## COMPLAINT FOR DAMAGES

COMES NOW, the Plaintiffs, and files this their Complaint in the United States District Court for the Northern District of Mississippi and for grounds which show the following facts:

1. The Plaintiffs are adult resident citizens of the State of Mississippi living in Monroe County, Mississippi.

2. The Defendant, Mayor Brandon Presley, is the elected Mayor of the City of Nettleton, Mississippi.

3. The Police Chief, Thomas Adams, is a duly appointed Police Chief of the City of Nettleton and was the supervising officer of the Police Department at the time that the incident, which is the basis of this law suit, occurred.

4. Gerry Turner is named as a defendant, as the arresting officer who filed charges of public profanity and made the arrest in this case and farther without



EXHIBIT
A

adequate justification maliciously sprayed pepper spray into a group of people, which included two children.

5. This is a Civil Rights lawsuit brought by the plaintiffs, which includes two minor children; Darius Smith, sixteen years old and Chandler Smith, eleven years old; claiming police brutality, false arrest, malicious prosecution, false prosecution of Charlotte Smith, deformation of character, racial profiling, applying a statute in a racial discriminatory manner, and assault which is all included in the Federal Civil Rights complaint and Pendant State causes of action.

6. Gary Turner is named as a Defendant as the arresting officer who filed the charges of public profanity and made the arrest in this case.

7. This is a civil rights lawsuit brought by the Plaintiffs which include two minor children, claiming police brutality, false arrest, malicious prosecution, false prosecution of minors, defamation of character, racial profiling, applying statute in racial discriminatory manner, malicious prosecution, assault which included the the Federal Civil Rights Complaint and pendent state causes of action.

8. Claims are made for compensatory damages, punitive damages, and attorney fees.

9. This action arises under the first, fourth, and fourteenth amendment of the United States Constitution and Sections 1981, 1983, and 1988 of 42 U.S. Code 1981, 1983, and 1988. Also pendant state claims for malicious prosecution assault, false arrest, deformation of character, and infliction of mental distress are included. Plaintiffs ask for a trial by jury on all issues in this case.

10. The Mayor, Brandon Presley, took an active role along with the Police Chief, Tommy Adams in the running of the Nettleton Police Department and that the City of Nettleton is a relatively small town and the mayor himself was actively involved in the operations of the police department.

11. On or about January 23, 2006, in Nettleton, Mississippi, Charlotte Smith, a well respected African-American was shopping with her child and nephew at a local store on the weekend in the city of Nettleton. A fight ensued on the parking lot of the store. Charlotte Smith was not involved in the fight but did assist the Manager of the store in breaking up the fight. Officer Gerry Turner, who was employed as a police officer with the city of Nettleton at the time, arrived after the fight had been broken up. To all present it was obvious there had been a fight and major disturbance threatening the peace of the town. To all present Charlotte Smith was the good person and not the criminal.

12. Charlotte Smith asked the defendant, Gerry Turner, who was acting under color of the law and as a police officer for the City of Nettleton, why he was not going to make an arrest. This officer, after several requests, said that he was not going to do anything and if Mrs. Smith wanted to take some action that she, herself would have to go to City Hall the following Monday to file charges. Being somewhat frustrated, Charlotte Smith got into the car with the minor children and muttered, in a relatively low voice, "I've had enough of this shit." Immediately thereafter, Gerry Turner, still acting under the color of state law, forced Mrs. Smith out of the car in the presence of the children and proceeded to handcuff her

in front of the minor children and pinned her against either the wall or car. By these actions, the children became hysterical and then the officer sprayed these children with pepper spray and maliciously filed charges against them in the youth court while still acting under the color of the City and State authority.

13. Police Officer, Gerry Turner, filed charges of public profanity against Charlotte Smith. The Charge of Public Profanity was later tried in spite of the fact it should have never been tried. The City Judge, after a lengthy trial, in the Municipal Court, correctly found Charlotte Smith not guilty. As a matter of law, the charge of Public Profanity in itself is un-Constitutional. It is un-Constitutional applied under these facts.

14. The Plaintiff, Charlotte Smith, alleges that there was a deliberate attempt by the City officials to keep Charlotte Smith from knowing the Court's decision since her attorney had to call to find out the verdict since the Judge took it under advisement. Plaintiffs allege that the Mayor, Brandon Presley; Police Officer, Gerry Turner; Police Chief, Tommy Adams; and other unnamed persons acted in a conspiracy to keep the disposition of this case quiet since the Judge took it under advisement. In fact, a written decision of the trial from April was not turned in until the fall of 2006 and Counsel for the Plaintiff had to call to get the decision. The Defendants hoped this case would go away and made a deliberate effort to see that occurred and immediately after the learning of deposition, a Notice of Claim under the Mississippi Tour Claims Act was sent the Mayor, Brandon Presley; The Clerk of the City of Nettleton, and Police Officer Gerry

Turner.

15. Plaintiffs allege that the actions of Officer Gerry Turner represented the policies and practices which were afforded and adopted by the City of Nettleton and its elected and appointed officials. The Mayor and the Police Chief, who were both actively involved in the running of the police department, failed to train and supervise its officers and acted in a racially discriminatory manner and failed to take proper actions to control the actions of its officers.

16. The Plaintiffs, including Charlotte Smith and the two children age sixteen and age eleven, have incurred attorney fees, mental anguish, mental distress, deformation of character, and other related damages. Each Plaintiff, being Charlotte Smith and the children, Chandler Smith and Darius Smith, each ask for an award of five hundred thousand dollars ($500,000) for actual and punitive, plus an award of attorney fees.

WHEREFORE PREMISES CONSIDERED, Plaintiffs demands the following:

1. Each Plaintiff, Charlotte Smith, Chandler Smith, a child age 11, and Darius Smith, a child age 16, demands actual and punitive damages in the sum of five hundred thousand dollars ($500,000).

2. That all Defendants be required to pay all reasonable attorney fees incurred by the Plaintiffs in the pursuit of this action.

3. All Plaintiffs, Charlotte Smith, Chandler Smith, a child, and Darius Smith, a child, demand a jury trial for all issues in this complaint.

WHEREFORE PREMISES CONSIDERED, this the _____ day of May,

2007.

**GENE BARTON          MSBN2102**
**POST OFFICE BOX 147**
**OKOLONA, MS 38860**
**TELEPHONE: 662-447-2522**
**FACSIMILE: 662-447-2526**
**MAIL: gbartonatty@bellsouth.net**
**ATTORNEY FOR PLAINTIFFS**


### DEMAND FOR JURY TRIAL

Comes now, all Plaintiffs: Charlotte Smith, Chandler Smith, and Darius Smith,

and asks for a jury trial on all issues.

Gene Barton, Attorney for the Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION


CHARLOTTE SMITH, CHANDLER SMITH,
ET AL                                    PLAINTIFFS

VS.                      CIVIL ACTION NO.: 1:07CV113-M-D

BRANDON PRESLEY, ET AL.                  DEFENDANTS




* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF CHARLOTTE SMITH

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *




TAKEN IN THE LAW OFFICE OF GENE BARTON
102 NORTH CHURCH STREET, OKOLONA, MISSISSIPPI
ON MAY 30, 2008




APPEARANCES NOTED HEREIN




Reported by:  VALERA EDWARDS-KNIGHT, CSR #1039
================================================
REID, BROWN & KNIGHT COURT REPORTING
14 COUNTY ROAD 337
OXFORD, MS 38655
(662) 816-9863





**VALERA H. KNIGHT, CSR**
**(662) 816-9863**

Q.    So let me start over.  Do you have any knowledge of the policies and procedures that are followed by the Nettleton Police Department?

A.    No.

Q.    Do you have any knowledge of the policies and procedures that they advise their officers to follow?

A.    No.

Q.    Do you have any knowledge of any other arrests that have been made by a Nettleton police officer where there was a charge of profanity?

A.    No.

Q.    Do you have knowledge of any other incidents where a Nettleton police officer, Mr. Turner, or any other officer used pepper spray?

A.    No.

Q.    Do you know what the Nettleton Police Department policies are with regard to the use of pepper spray?

A.    No.

Q.    Would you be able to tell me what the practice has been for police officers for the Nettleton Police Department with regard to the use of pepper spray?

A.    No.

Q.   Do you have any knowledge of what procedures are typically followed by a Nettleton police officer when an arrest is made?

A.   No.

Q.   Do you know anybody else that's been arrested by the Nettleton Police Department?

A.   I can't answer that.

Q.   All right.  I'm asking you about this arrest that occurred, I believe on January 22, 2006; is that correct?

A.   I think so.

Q.   Okay.  Where did your arrest occur?

A.   Dollar General.

Q.   That's the Dollar General store in Nettleton?

A.   Yes.

Q.   Where is that located?

A.   On Will Robbins Highway, I believe.

Q.   Do you remember what time of day it was?

A.   No.  It was evening is all I remember.

Q.   Do you remember what day of the week it was?

A.   Sunday.

Q.   What was your purpose for being there at the Dollar General?

A.    To buy household items.

Q.    Did you, in fact, go in Dollar General and shop?

A.    Yes.

Q.    Was this before your arrest?

A.    Yes.

Q.    Okay.  Did you purchase some household items?

A.    Yes.

Q.    And --

A.    I had them at the counter.  I never purchased them.

Q.    Why is that?

A.    Because the fight started outside.

Q.    Okay.  So had you gotten to the checkout counter already?

A.    Yes, standing in line.

Q.    Okay.  Then what did you see?

A.    Two girls started fighting.

Q.    This was outside the store?

A.    Yes.  One girl that was participating in the fight, she worked at the Dollar General.

Q.    Did you know her?

A.    Not personally, no.

Q.    Do you know her name?

A.    Courtney Johnson.

Q.    Did you know the other girl that was involved in the fight?

A.    No.

Q.    Do you know her name?

A.    No.

Q.    So you are standing there at the checkout counter, and you observe this fight break out just outside the store?

A.    I did.

Q.    All right.  Well, do you know what happened to start this fight?

A.    Just some other girls came to the store.

Q.    Okay.

A.    And started yelling, cursing, or whatever they were doing at Courtney.  She left out of the store, and that's when the fight occurred.

Q.    Okay.  And where did this fight occur?

A.    Right in front of the store.

Q.    Okay.

A.    In the parking lot.

Q.    Okay.  And how many girls were involved?

A.    I'm not sure.  I remember Courtney, and I remember a car with other girls in it.

Q.    Okay.  But you recall that it was mainly

Courtney and one other girl?

    A.   Yes.

    Q.   Tell me about this fight. I mean were punches thrown, or was it just yelling and cursing, or what?

    A.   A couple of punches thrown, hair pulling, nails breaking, cursing, yelling, screaming.

    Q.   Did you leave the checkout counter to go outside?

    A.   First, the other girl that was working at Dollar General, she left her register to go outside to break it up. She couldn't break them up by herself. So -- and everybody else was just kind of standing around looking, and I went out to help her.

    Q.   Okay. Do you remember the name of this other worker?

    A.   I forgot her name, but I've seen her in Dollar General a lot of times. And I think she used to be in my kindergarten class when I was working at Nettleton.

    Q.   Was she a manager or anything like that?

    A.   I'm not sure what her exact position is.

    Q.   How many people were standing at this checkout counter when this employee left to go try to break up the fight?

A.    It was about four of us standing there.

Q.    Do you know the names of any of those persons?

A.    No.  I didn't know them.

Q.    Did anybody else go outside to help you?

A.    No.

Q.    So you saw this other employee.  She was unsuccessful in breaking up the fight, so you went outside to help her?

A.    Yes.

Q.    Now who else was with you?

A.    My son.

Q.    Okay.  Is that your son, Chandler?

A.    Yes.

Q.    Was he standing at the counter with you?

A.    Yes.

Q.    When you went outside, what did he do?

A.    I think he came out behind me and stood by the wall.

Q.    All right.  Well, tell me about trying to break up this fight.

A.    When we got out there, when I got out there, they had sort of just locked up.  Both of them had hands of hair.  They were holding each other by the hair, and neither one would let go.  So myself

and the lady that works in Dollar General, we just pried Courtney's hands out of the girl's hair. And then we pushed them away. Both of them backed up. But the other two girls never would leave. So there was a lot of yelling and cussing like they were going to fight again. And somebody called the police. I had my cell phone. I dialed 911, but 911, the line was busy. So, the next thing I know the police arrive.

Q. Okay. So you got them separated, but this girl and kind of the group that was with her, they weren't going to leave and continued to agitate the situation?

A. They would not leave, and they did agitate it.

Q. So were they yelling and cursing at Courtney?

A. Yes. They were yelling and cursing at each other back and forth.

Q. Okay. So Courtney was also yelling and cursing back and forth?

A. Yes.

Q. Did anybody else get involved in trying to break it up?

A. When they kind of got apart, I believe

that's when I saw my sister and her son.  They just came up to Dollar General to buy something.

Q.   Okay.

A.   And my sister was kind of talking to Courtney to try to get her to calm down or whatever. And she was asking me what was going on.

Q.   Now for the record, this is your sister, Tajuana?

A.   Tajuana Smith.

Q.   And her son, Darius?

A.   Darius.

Q.   How old is Darius?

A.   He is 17 now.

Q.   Was he 15 at the time?

A.   Fifteen at the time.

Q.   All right.  So Tajuana started talking to Courtney.  Did Tajuana know Courtney?

A.   Yes.

Q.   Did you ever determine whether or not Courtney knew these girls that were fighting with her?

A.   Later on somebody told me that they were related.

Q.   Okay.  Then what happened?

A.   Then after that Mr. Turner came.

36

Q.   Okay.

A.   Everybody was still agitated.  He got out of his car sort of agitated.  He came alone and was asking Courtney to get against the wall and to back up.  He was talking to the other girls that were in the car.  Courtney was still agitated.  I was trying to talk to her to get her to calm down, and nobody was calming down.  She kept saying she wanted to press charges.  He was telling her she needed to call and do it another day, the next day or whatever. That Monday, the next day.  And I did ask him why she couldn't press them now.  He said she would have to sign an affidavit to do that.

Q.   Let me stop for a moment before I get to your conversation with Mr. Turner.  But Mr. Turner had further separated the girls and got Courtney to go next to the wall, that's the wall of the store?

A.   Yes.

Q.   The outside wall of the store?

A.   Yes, outside.

Q.   The girls --

A.   I think they were in the car.

Q.   Okay.  Was Mr. Turner talking to them?

A.   Yes.

Q.   Do you remember anything that he said to

those girls?

A.    No.  I wasn't listening to them.

Q.    Then he also spoke to Courtney?

A.    Yes.

Q.    Then she said she wanted to file a charge?

A.    Well, he yelled for her to get back against
the wall and to step back.

Q.    While this was happening, were the girls
still screaming and cursing each other?

A.    Yeah, everybody was still upset and
screaming and cursing and hollering, whatever.

Q.    Did Mr. Turner have to raise his voice --

A.    Yes.

Q.    -- at the different parties, so to speak,
to get them to settle down?

A.    Yes.

Q.    Do you remember anything specifically that
he said to them?

A.    No.

Q.    You just remember he raised his voice?

A.    Yes.  And asked Courtney to step back
against the wall, to get back.

Q.    Okay.  While he was trying to keep them
separated, were they trying to move closer to one
another?

Mr. Turner?

Q.   Yes.

A.   I was about five, six feet from my car.

Q.   Okay.  At the time you started talking to Mr. Turner, where was your son, Chandler?

A.   He was beside me kind of standing behind me a little bit.

Q.   All right.  Now tell me about your conversation with Mr. Turner.

A.   He -- I asked him why couldn't Courtney press charges that day, because I saw what happened, and I could be a witness for it.  He said she needed to wait and sign an affidavit if she wanted to press charges.  And we had conversation back and forth about an affidavit.

And I told him, I said, well, you don't have to explain to me what an affidavit is.

Yeah, I think I do, because you don't understand what an affidavit is.

I told him, yeah, I had worked for an attorney.  I did have an understanding of an affidavit.

And he said, well, if she wants to press charges, she'll have to come down tomorrow and do it.  She can't do it tonight.  They weren't arresting

anybody that evening.

Then we got back on the conversation of an affidavit. And I told him, I said, really, you ain't got to tell me shit. I turned and walked away.

Q. While you were having this conversation with Mr. Turner, I mean what was your demeanor? What was this just a calm conversation?

A. Yes. Because I don't get loud. I'm not a loud person.

Q. Was he responding the same way in a calm manner?

A. No.

Q. Was he yelling at you?

A. He was agitated. He -- the scene that was going on, the fight, the other girls yelling and cursing and people were around, he left that alone and put his attention on me.

Q. Okay. So, basically, he had been having to raise his voice at these ladies who wouldn't calm down. And when he got in that conversation with you, you are saying he kept the same tone and demeanor?

A. Same tone and demeanor.

Q. So he was agitated or frustrated or whatever with these girls and then continued to be so during his conversation with you?

A.    Yes.

Q.    All right.  That conversation ended with you telling him you don't have to tell me shit, and you turned and walked away?

A.    Yes.

Q.    Then what happened?

A.    Then I heard him tell somebody, which I did not know he was talking to me, to put your hands behind your back.  Then I heard my sister from the side saying, what?  And I just got my son.  I said, Nute, get in the car.  That's his nickname.  And we was getting in the car, that's when I felt somebody grab my right arm.  And when he grabbed my right arm, he put it behind my back, threw me into the hood of my car.

Q.    Okay.  I apologize.  Let me back up just for a moment.  While you were having this conversation with Mr. Turner or Officer Turner, where was Tajuana Smith?

A.    She was standing by the wall of the Dollar General, outside.

Q.    All right.  How far away was she from you and Officer Turner?

A.    She was maybe a foot to my side.

Q.    Okay.  So she -- was she listening to your

conversation?

A.   Yes.

Q.   Where was Darius?

A.   I think he was standing with her, with his mother.

Q.   So you and your sister were standing there. Both of your sons are there with you, and you're having this conversation with Mr. Turner?

A.   Yes.

Q.   You said what you needed to say.  You turned around.  You walked away with your son.  You heard him say, put your hands behind your back; is that right?

A.   Yes.

Q.   You told your son to get in the car; you continued to your car, right?

A.   Yes.

Q.   And then you felt somebody grab your arm?

A.   Yes.

Q.   Now when you say threw you on the hood, can you describe that anymore specific than that?

A.   He had my right hand behind my back.  He took his hand and put it in the back of my neck and slammed me against the hood of my car.

Q.   Did your face hit the hood of your car?

this was a cold day.

 A. It wasn't that cold at all.

 Q. So the windows might have been cracked?

 A. Probably so.

 Q. Okay.  Do you know for sure?

 A. I'm not sure, but I usually ride with them cracked.

 Q. Okay.  So you're laying on the hood of the car.  You observed him jump in the car and lock the door, okay.  What do you remember happening next?

 A. Then I was calling for him to get out of the car and go to my sister.  He was crying and yelling and scared, and he wouldn't get out of the car.  And I kept asking Mr. Turner to let me talk my son out of the car.  And he said he did not give a damn about my son, and I kept yelling for my son to come out.  Finally, he came out.  And at that time I had -- by the time my son came out of the car, I had both hands in handcuffs behind my back.

 Q. Okay.  And you're still laying on the hood of your car?

 A. Yes.

 Q. Okay.  So your son came out and did what?

 A. He ran to my sister, who was standing on the wall at the Dollar General.

Q.   All right.  Did you hear anything else or see anything else that was said or done by anyone besides your son, Chandler?

A.   Well, my son ran.  I remember hearing my sister saying, why is she being arrested.  I remember hearing other people just chattering, like this is so wrong.  Why is he arresting her, and that was about it and my son crying.

Q.   From your position on the car, could you see your sister?

A.   No.  I didn't see her.

Q.   She was behind you?

A.   Yes.

Q.   These others that you heard talking, did you see them or --

A.   They were just -- I wasn't looking at them. I was a bit embarrassed at that time.

Q.   Okay.

A.   And I was looking at my son.  That was the only person I wanted to see.

Q.   Did you ever see Darius?

A.   No, not when I was on the car.

Q.   Did you hear anything that he said?

A.   No.

Q.   What do you recall next?

A.    Then I recall when my son ran from the car, that's when Mr. Turner pulled out his pepper spray. He sprayed my son.  My sister was standing beside my son, and Darius was standing beside them.  They got sprayed.

Q.    Did you see Officer Turner spray pepper spray towards your son, Chandler?

A.    Yes.

Q.    Okay.  Now when he's getting out of the car, he's running towards your sister, is she behind you?

A.    Yes.

Q.    Now what part of all that did you observe?

A.    I observed all of it.

Q.    Okay.

A.    Because I had my eyes on my son.

Q.    Okay.  While you were still laying on the hood?

A.    Yes.

Q.    Okay.  Did you see your son run all the way to your sister?

A.    I saw him go just straight back to her.

Q.    Okay.

A.    Because when he ran past me, this side of my face was lying on the hood, so I could push my

A.    When I saw the liquid, I looked at him kind of, and I just saw his hand and cupped like that.    I did not see the spray, but I saw the liquid coming from his hand.

Q.    Which hand did he have the spray in?

A.    I'm not sure.    I wasn't paying that much attention.    When I saw the liquid, I looked at my son.

Q.    By this time were you in handcuffs?

A.    Yes.

Q.    Okay.    So did he have any hands on you?

A.    He had one hand on me, still did.

Q.    Do you remember which hand?

A.    No.

Q.    Was it the one that was --

A.    I couldn't tell you which one it was.

Q.    By your head or by your neck?

A.    He had me by the cuffs on the hand.

Q.    Okay.    So one hand using to hold your cuffs --

A.    Uh-huh (affirmative response.)

Q.    -- while you are still laying on the hood. And the other hand, you don't know which one was used for the pepper spray?

A.    Yes.

Q.    You say you saw liquid being shot at your son, Chandler, as well as your sister and your nephew; is that right?

A.    Yes.

Q.    Did you see it hit anybody else?

A.    I saw it hit those three.

Q.    Okay.  After seeing that spray, what did you see next?

A.    He pulled me up off the car, and I saw my nephew, Darius.  He ran to my other sister's house. I have another sister that lives close to Dollar General.  When the spray hit him, he left and ran to wash his eyes out.  And I remember this boy, Hadji, he got my son who took him in the store and got a bottle of water to try to wash the spray out of his eyes.

Q.    Okay.  So your other sister, who is that?

A.    Tanya White.

Q.    So Tanya lived near by?

A.    Yes.

Q.    And Darius you say, when he was hit with the spray, he left and ran to your sister, Tanya's, house?

A.    Yes.

Q.    Okay.  Did you observe Chandler's

reaction --

A.    Yes.

Q.    -- before he was taken inside the store by Hadji?

A.    Yes.

Q.    Okay.  And what did he do?

A.    He was crying and grabbed his face and started rubbing his eyes.

Q.    Now was he crying before that?

A.    Yes.  He was crying as soon as I was placed on the hood of my car.

Q.    Okay.

A.    That's what made him jump in the car and lock the door.

Q.    So after the spray, he continued to cry, and then he was rubbing his eyes?

A.    Yes.

Q.    I apologize if you gave me this information earlier, but I'm not sure I remember it.  When you were on the car, the hood of the car being arrested, and Tajuana and Darius were against the wall or by the wall and Chandler ran to them, how far away was Tajuana from you and Officer Turner?

A.    About four or five feet, maybe.  Everybody was fairly close, but nobody was moving.

Q.   So the front of the store was only four or five feet away from the parking lot?

A.   From where I was parked.

Q.   Okay.  What was the race of all the girls that were in this confrontation?

A.   African American.

Q.   They were all African American?

A.   Yes.

Q.   This other employee that went out there to try to break it up, was she African American?

A.   Yes.

Q.   Were the bystanders that were coming and going from the store and stopped to watch, were they African Americans?

A.   Some were.

Q.   Were there a few that were white?

A.   I saw some white people, yes.

Q.   While you were on the hood of your car and you were dealing with your son who went in the car and you were trying to get him to come out and talking to Officer Turner and then finally came out, during that time period, do you know where Darius was?

A.   I think he was standing with his mother.

Q.   I appreciate that.  But I guess I'm asking

crowd that was there and these girls?

A.   I can't answer that.  I wouldn't know what he would look like nervous.

Q.   Well, you described him as agitated, so.

A.   Yes.

Q.   You wouldn't be able to say whether or not he was nervous about the situation?

A.   I wouldn't say he was.  I don't know if he was nervous or not.  I know he was agitated.  He didn't like the situation or whatever, like anybody else would be.

Q.   So at no time did Officer Turner pull you or your son Chandler out of your car?

A.   No.

Q.   Nor did he pull anyone else out of a car?

A.   No.  He put me in a car.  I was never pulled out of the car.

Q.   He put you on your car; is that right?

A.   I was put on my car and in his car.

Q.   Right.

A.   Yes.

Q.   Did any of the pepper spray get on you?

A.   A little bit.

Q.   Okay.  Did it cause any burning of your eyes or --

A.    Just around the bottom lid.

Q.    Okay.  How long did that last?

A.    It was until after I got to the police station, and I went to the bathroom, and I kind of doused my lids.  So I guess when I finally got to the bathroom, it was probably about a hour.

Q.    Okay.  What did you experience during that time?

A.    The burning --

Q.    Yes.

A.    -- sensation.

Q.    Your skin was burning?

A.    It was the bottom lids of my eyes was burning.

Q.    Were your eyes watering?

A.    Yeah.  They got a little watery, not bad though.

Q.    All right.  I think where we stopped in this turn of events was Darius running to your sister's house.  Chandler being taken inside by Hadji?

A.    Yes.

Q.    And that's Hadji Perry?

A.    Yes.

Q.    Mr. Perry takes him inside.  What is

A.    My sister.  They took him to her house.

Q.    While you were at the police department, other than the conversation about the bond, do you remember any other conversation with Officer Turner?

A.    No.  He just counted my money in my purse and took my information.

Q.    Did you ever apologize to Officer Turner for getting involved?

A.    No.

Q.    Did you ever say anything to him that you shouldn't have opened your mouth?

A.    I remember saying maybe it wasn't a good idea to try to help somebody, because I was the only one that went to jail that night.

Q.    What were you told you were being charged with?

A.    Public profanity.

Q.    When did Officer Turner tell you that?

A.    When he was filling out the paperwork.

Q.    Did you have any discussion with him about that charge?

A.    No.

Q.    After you bonded out, did you go home?

A.    I went to my sister's house to get my son.

Q.    Then did you just go home?

A.    I stopped at my other sister's house, and then I went home.

Q.    Okay.  Did you -- or did you ever go to the hospital or anything like that?

A.    No.

Q.    Did you take Chandler to the hospital or to see a doctor?

A.    Not that -- no.

Q.    Did you ever take -- did you ever go to a hospital or to a doctor for any injuries you relate to the arrest?

A.    No.

Q.    Was the only thing you experienced the burning in your bottom eyelids?

A.    Yes.

Q.    Are you claiming any other injuries?

A.    No.

Q.    Physical injuries?

A.    No.

Q.    How about with Chandler, did he -- by the time you got to him, was he still suffering from any of the effects of the pepper spray?

A.    When I got to him, he said that his eyes were feeling better, cause my sister had, when she got him home, she continued to wash his eyes or

whatever they did. And after that he didn't have anything that was wrong with his eyes. He started having, I believe, mental problems.

Q. Okay. Just about seeing the arrest?

A. Yes.

Q. Okay. So you never had to take him to a doctor or anything about his eyes?

A. No.

Q. Or any burning from the pepper spray?

A. No.

Q. You say you spent about two hours at the police department?

A. Yeah, maybe. I don't remember exactly how long. I remember it was some hours. It was dark when I left.

Q. Okay. Then you went directly to your sisters's house?

A. Yes.

Q. By two or three hours after the incident, he had told you just what you said, that he was better, his eyes were better?

A. His eyes weren't burning as bad. They weren't bad.

Q. The next day, did he have any problems?

A. He didn't complain about his eyes, no.

A.    At the jail.

Q.    Okay.  What were they doing?

A.    Talking to Mr. Turner.

Q.    Okay.  So he'd already arrested you and had charged you with public profanity?

A.    Yes.

Q.    Were they involved in any meetings with you?

A.    No.  I never met with them.

Q.    Do you know what they talked to Officer Turner about?

A.    No.  They were in a private room.

Q.    Okay.  Do you have any knowledge that either Mayor Presley or Chief Thomas Adams made the decision with respect to your arrest?

A.    Or had knowledge of it?

Q.    Yes.

A.    I can't answer that.

Q.    Okay.  Do you have any knowledge that they directed Officer Turner to arrest you for public profanity?

A.    I can't answer that either.  No, I don't.

Q.    Do you have any knowledge of any other alleged constitutional violations by Officer Turner?

A.    On anyone or myself?

Q.   Who?

A.   Seaman, S-E-A-M-A-N.

Q.   Where is Dr. Seaman?

A.   Nettleton.

Q.   One of the claims that you have made in your complaint is for defamation?

A.   Uh-huh (affirmative response.)  Yes.

Q.   What do you understand that is?

A.   Like defamation of character?

Q.   Yes.

A.   Yes.

Q.   What is the basis of that claim?

A.   Well, it's basically got a lot to do with my job.  I mean, I didn't -- I don't want my employees to think that I'm just out there running around cussing people out or doing stuff in public. That's not me at all.

Q.   Okay.  Now, Officer Turner accused you of saying the word, shit?

A.   Yes.

Q.   Which you did say?

A.   Yes.

Q.   And that's the basis of the public profanity charge, correct?

A.   That was it, yes.

A.   I was on the bypass, so it was in another county.   I'm not sure exactly what county it was in. It was between here and Meridian.

Q.   Were you alone?

A.   No.  I had a friend with me.

Q.   Was Chandler with you?

A.   No.

Q.   I'm just going to ask you this question, Mrs. Smith.  I don't know if in part of your claim or not you contend that you were arrested because of your race?

A.   Part of it.

Q.   Okay.  Why do you say that?  Why do you believe that?

A.   Like I said before, because I have been around white males, white females that were talking to white officers or mainly white officers cursing and saying far worse than I did say that day, and they were not arrested.

Q.   But do you have any knowledge of any white individuals using profanity in front of Officer Turner?

A.   Yes.  Oh, not in front of Officer Turner but officers.

Q.   Other than officers for the City of

Nettleton?

A.   Yes, plenty of them.

Q.   Do you have any basis for believing that Officer Turner arrested you because of your race?

A.   Not just race but part of it.

Q.   Why do you believe Officer Turner had race in mind when he arrested you?

A.   I think because I may have questioned him too much, and maybe I stepped out of my place, in his belief.

Q.   Do you have any knowledge of persons of other races who have questioned Officer Turner for acting in a similar fashion as you that he did not arrest?

A.   No.  I have no knowledge.

MR. HALBERT:  Okay, Mrs. Smith.  That is all I have.

MR. BARTON:  I have one or two things I wanted to clear up.

EXAMINATION

BY MR. BARTON:

Q.   Mrs. Smith, you were asked about expenses. You didn't make any mention -- did you incur any legal fees or?

A.   Yes, yours.

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

CHARLOTTE SMITH; CHANDLER SMITH,
ET AL.                                                          **PLAINTIFFS**

VS.                                            **CIVIL ACTION NO.: 1:07CV113-M-D**

BRANDON PRESLEY, ET AL.                                         **DEFENDANTS**

## <u>DECLARATION OF GERRY TURNER</u>

Pursuant to 28 U.S.C. § 1746, I, Gerry Turner, testify as follows:

1.      My name is Gerry Turner. I am over twenty-one (21) years of age and have personal knowledge of the facts set forth herein.

2.      I am an adult resident of Lee County, Mississippi and was formerly employed as a police officer with the City of Nettleton, Mississippi.

3.      I began my employment with Nettleton on February 4, 2004. Prior to my employment with the City of Nettleton, I worked as a police officer for the cities of Southaven, Mississippi and Tupelo, Mississippi. I began my law enforcement career in Tupelo in June of 1998 and attended the Mississippi Law Enforcement Officer's Training Academy upon my employment. I graduated from the academy and received my professional certificate on or about September 10, 1998. S*ee Professional Certificate for Gerry Turner, attached hereto as Exhibit 1.* I had been employed as a police officer for over three and a half years before the incident occurred which is the subject of this litigation.

4.      In addition to the training I received at the academy, I attended other training seminars over the years. I was certified to carry and use O.C. spray during my academy training and I attended refresher courses from time to time during my law enforcement career. While

TO.255168.1



**EXHIBIT**

C

employed at Nettleton, I attended the Mississippi Law Enforcement Training Conference in September 2004. *See Training Certificate, attached hereto as Exhibit 2.*

5.　　On January 22, 2006, while I was on routine patrol, I answered a call regarding a disturbance at the Dollar General located in Nettleton, Mississippi. When I arrived, there was a crowd in the parking lot of the Dollar General and some of the females were yelling at one another. I learned that these females had been involved in a physical altercation, which had been broken up. I proceeded to keep the parties involved in the conflict separate from one another and I began to talk to each party about the incident. Because I did not witness the altercation, I began to explain to each party what they needed to do if they wanted to file a complaint. During my discussions with each party, I repeatedly had to instruct the other party to calm down and keep quiet.

6.　　After discussing the process for filing a complaint with the parties involved in the altercation, I was approached by Charlotte Smith. I did not know Charlotte Smith at the time. Ms. Smith began questioning my decision not to arrest anyone and I made repeated attempts to explain my decision and what would be required for charges to be filed. At the time of this conversation, the parties involved in the altercation were still present and I believed the scene to still be emotionally charged. Ms. Smith was not satisfied with my explanations and she proceeded to use profane language. Believing that she committed a crime, I placed her under arrest. While I was arresting Ms. Smith, a young man who appeared to be with Ms. Smith said, "Hell, no" and began to approach me. The crowd was getting agitated and others who were standing behind me were closing in. I was the only officer on the scene. At this point, I grabbed my pepper spray and, while still holding Ms. Smith, I sprayed an arc behind me to keep the young man and others in the crowd from advancing on me and provide a protective buffer.

- 2 -

I declare under penalty of perjury that the foregoing statement is true and correct, this the 21st day of July, 2008.

_____
Gerry Turner

TO.255168.1



STATE OF MISSISSIPPI

Board of Law Enforcement Officer Standards and Training

Hereby awards this

*Professional Certificate*

TO

**GERRY W. TURNER**

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

This 10ᵀᴴ day of SEPTEMBER, 19 98

As being qualified to be a Mississippi Law Enforcement Officer under
Provisions of Chapter 474, General Laws of Mississippi, 1981.

Director
Board on Law Enforcement
Standards and Training

Chairman
Board on Law Enforcement
Standards and Training

Certificate No. 11715

EXHIBIT



Certificate No. __MLETC 04__

# STATE OF MISSISSIPPI

Board on Law Enforcement Officer Standards and Training

Hereby awards this

## Certificate of Training

Mississippi Law Enforcement Training Conference

Tupelo, Mississippi

September 23 – September 25, 2004

TO

### Gerry Turner

Nettleton Police Department

_____
Director, Office of
Board on Law Enforcement
Standards and Training

_____
Training Director
Board on Law Enforcement
Standards and Training

EXHIBIT
2